**In the Matter of 183 LORRAINE STREET ASSOCIATES, Debtor.**

**Nos. 95–CV–5062, 95–CV–5348, 96–CV–119, 96–CV–211 and 96–CV–818.**

United States District Court, E.D. New York.

July 3, 1996.

through September 1995 ($249,413.56) is $207,- 586.44.

**18**

Joseph Fischer, New York City, pro se.

Gerard Zwirn, New York City, for French Bourekas.

Raymond Mellon, Zetlin & DeChiara, New York City, for Appellee.

GLASSER, District Judge:

## SUMMARY

This is a state foreclosure action disguised as an involuntary Chapter 11 bankruptcy case. This case illustrates both the extent to which the protections of Chapter 11 can be perverted into weapons against unsuspecting creditors as well as the pitfalls awaiting a mortgagee that does not diligently extricate itself from the bankruptcy appellate process.

The debtor is 183 Lorraine Street Associates ("Lorraine"), a limited-partnership real estate holding company. Lorraine's sole asset is a parcel of commercial real estate located at 183 Lorraine Street in the Red Hook district of Brooklyn, New York (the "Premises").

As in many other single asset cases, the appellants manipulated the bankruptcy process to prevent United Capital Corporation ("UCC") from foreclosing its mortgage. However, in a bizarre twist on this common scenario, rather than moving to dismiss the Chapter 11 case, UCC intervened and proposed a plan of reorganization.

Before this court are appeals from the bankruptcy court's orders continuing the pre-bankruptcy receiver for the Premises; annulling the automatic stay; approving a disclosure statement; denying a motion for valuation of the Premises; and confirming a plan of reorganization. After a thorough review of the record, this court vacates the orders appealed in 95–CV–5348, 96–CV–211 and 96–CV–818, affirms the order appealed in 95–CV–5062, and dismisses the appeal in 96–CV–119.

## BACKGROUND

These appeals are related to this court's opinion in *French Bourekas Inc. v. Turner*, 199 B.R. 807 (E.D.N.Y.1996), familiarity with which is presumed. For the purposes of these appeals, the relevant facts are as follows:

### I. The Mortgages

On February 2, 1988, Lorraine entered into transactions encumbering the Premises with first and second real estate mortgages. The first mortgage secured a note (the "CrossLand Note") obtained from the predecessor of CrossLand Commercial Funding Corporation ("CrossLand") in the principal amount of approximately $3,000,000. *See CrossLand Commercial Funding v. Lorraine Properties, Inc.*, DN 92–CV–2325, Complaint ¶¶ 10–13 and Exs. A, C, & D (E.D.N.Y. May 15, 1992). The second mortgage secured a note (the "UCC Note") obtained from the predecessor of United Capital Corporation

("UCC") in the principal amount of approximately $750,000. *See United Capital Corp. v. 183 Lorraine Street Assoc., et al.,* Kings Co. Index. No. 16846/90 slip op. at 5 (N.Y.Sup.Ct. May 28, 1991).

In January 1989, Lorraine obtained a loan of $250,000 from Joseph K. Nathanson, which was secured by a third mortgage on the Premises. This money allegedly was used to reduce the principle amount of the UCC Note to $500,000.

## II. The Foreclosure Action

On May 31, 1990, Lorraine defaulted on its obligations under the UCC Note. On June 25, 1990, UCC commenced an action to foreclose its mortgage against Lorraine in New York Supreme Court for Kings County (the "State Court"), pursuant to which a receiver, William Turner ("Turner"), was appointed. *See United Capital Corp. v. 183 Lorraine Street Assoc.,* Kings Co. Index No. 16846/90.

In May 1991, UCC obtained a summary judgment of foreclosure against Lorraine. In February 1992, UCC added French Bourekas Inc. ("FBI"), a tenant of the Premises, as a defendant in the foreclosure action and on January 20, 1993 obtained a summary judgment of foreclosure against FBI as well. In late June 1993, UCC filed a motion in the State Court for a judgment of sale pursuant to New York RPAPL § 1351(1).[1] That motion was returnable on July 14, 1993.

1. New York Real Property Actions & Procedure Law § 1351(1) provides in part that "[t]he judgment shall direct that the mortgaged premises ... be sold by or under the direction of the sheriff of the county, or a referee."

2. Section 362(a)(1) of 11 U.S.C. provides generally that:
 ... [A] petition filed under ... this title ... operates as a stay, applicable to all entities, of—
 the commencement or continuation ... of a judicial ... action or proceeding against the debtor that was or could have been commenced before the commencement of a case under this title[.]

3. Section 1452(a) of 28 U.S.C., "Removal of claims related to bankruptcy cases," provides in pertinent part:

## III. FBI's Bankruptcy and the Removal of the Foreclosure Action

On July 6, 1993, FBI filed a voluntary Chapter 11 petition in Bankruptcy Court for the Southern District of New York. *In re French Bourekas Inc.,* Ch. 11 No. 93–B–43470 (S.D.N.Y. July 6, 1993). Since FBI was a defendant in the foreclosure action, the filing triggered an automatic stay of UCC's motion for a judgment of sale. See 11 U.S.C. § 362(a).[2]

On October 4, 1993, FBI removed the foreclosure action to the Bankruptcy Court for the Eastern District of New York (the "bankruptcy court") pursuant to 28 U.S.C. § 1452[3] and Bankruptcy Rule 9027.[4] *See United Capital Corp. v. 183 Lorraine Street Associates (In re French Bourekas Inc.),* Ch. 11 No. 93–B–43470, Adv. No. 193–1451 (E.D.N.Y. October 4, 1993).

In October 1993, the bankruptcy court granted UCC's motion to lift the automatic stay to enable it to prosecute the foreclosure action. On December 15, 1993, UCC, represented by Raymond Mellon ("Mellon"), moved the bankruptcy court for an order remanding the foreclosure action to the State Court. FBI contended that it had not been properly served. The following colloquy took place at the hearing:

> THE COURT: I am not going to grant the motion to remand.
>
> MR. MELLON: Is the basis for that because of the service? Is it on a procedural matter[ ] or substantive basis?

> *A party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending,* if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.
> (emphasis added).

4. Bankruptcy Rule 9027(e)(1) provides in pertinent part:
 After removal of a claim or cause of action to a district court the district court or, if the case under the Code has been referred to a bankruptcy judge of the district, the bankruptcy judge, may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the court from which the claim or cause of action was removed or otherwise.

THE COURT: No, sir, both. I am not going to remand it because I think that it should be heard by the bankruptcy court. Which bankruptcy court it should be heard by, is a more interesting question. . . .

MR. MELLON: I am somewhat confused here. We have a situation of foreclosure for 3½ years. I have a debtor here, who is not a mortgagor, solely in there pursuant to a lease which nobody disputes is subordinate. It is by the provisions of the lease. It is by the determinations of Justice Shaw. It is the subject of appeal to the Appellate Division Second Department. We have right there two forums already deciding what is in front of it. In front of Ju[dge] Brozman who then determined that the [ ] stay should be lifted.

THE COURT: The lifting of the stay merely permits the foreclosure action to proceed. It doesn't determine the forum in which that proceeding takes place. The removal transferred that from State Court to this Court.

. . . .

MR. MELLON: I guess my confusion here is dealing with the basis of why this is not remanded, when it is solely a state issue and we have something that is at the very end of a long litigation, to have to make a motion for the judgment of foreclosure and sale and have the judge determine the amount of attorney's fees are totally state issues. I can't understand how it is staying here.

Tr. Dec. 15, 1993, at 6–7.

Had UCC only permitted the bankruptcy court to enter a final order denying its motion to remand the foreclosure action, it could have appealed the denial and this court would have reversed and remanded to state court, where the foreclosure action properly belonged. Instead, UCC voluntarily moved for permission to withdraw its remand motion without prejudice. On December 22, 1993, the bankruptcy court entered an order granting this motion. UCC abandoned the remand motion and instead pursued a judgment of foreclosure in the bankruptcy court.[5]

### IV. Lorraine's Bankruptcy and the "Re-Removal" of the Foreclosure Action

On September 26, 1994, as FBI's bankruptcy petition neared its inevitable dismissal, FBI, Joseph Fischer ("Fischer"),[6] and Kin Chi Heating & Plumbing filed an involuntary Chapter 11 petition against Lorraine. *In re 183 Lorraine Street Associates*, Ch. 11 No. 194–17830–352 (E.D.N.Y. Sept. 26, 1994). FBI's Chapter 11 petition was dismissed with prejudice on October 5, 1995. *In re French Bourekas Inc.*, 175 B.R. 517 (Bankr.S.D.N.Y. 1994) (dismissing petition and sanctioning FBI).

On September 29, 1995, UCC purchased the CrossLand Note and mortgage for approximately $750,000. *CrossLand Commercial Funding v. Lorraine Properties, Inc.*, DN 92–CV–2325, Letter of Raymond T. Mellon (E.D.N.Y. May 1, 1995). Although UCC thereafter held over $5,000,000 in debt secured by the mortgages on the Premises, UCC was automatically stayed from foreclosing because of Lorraine's bankruptcy. See 11 U.S.C. § 362(a)(1).

On October 14, 1994, UCC intervened in Lorraine's bankruptcy as a creditor. On December 13, 1994, UCC "re-removed" the foreclosure action to the bankruptcy court "out of an excess [sic] caution."[7] *United Capital Corp. v. 183 Lorraine Street Assoc., et al. (In re 183 Lorraine Street Assoc.)*, Ch.

---

5. Apparently, the bankruptcy court orally granted UCC a judgment of foreclosure and sale on March 30, 1994 but did not settle an order proposing findings of fact and conclusions of law until June 15, 1995.

6. Fischer claims to have been the vice president of Lorraine Properties, Inc. (the general partner corporation of Lorraine) and the managing agent of the Premises before it was placed in receivership. He filed a claim against Lorraine's bankruptcy estate for unpaid pre-petition management fees and also asserts an equitable interest in the Premises as a contract vendee.

7. In its removal petition, UCC wrote that it was

concerned that FBI or purported creditor Joseph Fischer will claim that the Consolidated Foreclosure Action/New Adversary Proceeding pending before this Court was returned to the State Court upon dismissal of its Bankruptcy Case.

11 No. 194–17830–352, Adv. No. 194–1469 (Bankr.E.D.N.Y. Dec. 21, 1994).[8]

Lorraine did not propose a plan of reorganization during the exclusive 120–day period it had to do so. See 11 U.S.C. § 1121(b).[9] On April 28, 1995, UCC filed a plan of reorganization pursuant to 11 U.S.C. § 1121(c)(2)[10] (the "Plan") and a disclosure statement pursuant to Bankruptcy Rule 3016.[11]

On June 16, 1995, the bankruptcy court entered an order continuing Turner as receiver for the Premises. Fischer and FBI appealed that order to this court. On October 26, 1995, this court affirmed the bankruptcy court's order continuing Turner as receiver. *In re 183 Lorraine Street Assoc.,* DN 95–CV–3137 (E.D.N.Y. Oct. 26, 1995). An appeal by Fischer and FBI was subsequently dismissed. *See 183 Lorraine Street Assoc. v. United Capital Corp.,* No. 95–5094, 1996 WL 282122 (2d Cir. May 29, 1996).

On November 3, 1995, this court orally granted UCC a judgment of foreclosure and sale, appointed Salvatore DeMatteo as referee, and ordered the Premises to be sold at public auction. On November 8, 1995, this court issued a written judgment of foreclosure and sale which adopted the bankruptcy court's June 15, 1995 proposed findings of fact and conclusions of law. See 28 U.S.C. § 157(c)(1).[12] *See United Capital Corp. v. 183 Lorraine Street Assoc.,* DN 95–CV–3628 (E.D.N.Y. Nov. 8, 1995). An appeal by

Fischer and FBI was subsequently denied. *See United Capital Corp. v. 183 Lorraine Street Assoc.,* No. 95–5101, 1996 WL 282118 (2d Cir. May 29, 1996).

This should have ended the litigation. UCC has never supplied a satisfactory reason for why it did not simply execute the judgment of sale ordered by the State Court, this court, and the Court of Appeals.

## V. Subsequent Proceedings in the Bankruptcy Court

On November 16, 1995, *notwithstanding this court's judgment of foreclosure and sale,* UCC moved the bankruptcy court pursuant to 11 U.S.C. § 1127(a)[13] and Bankruptcy Rule 3019 to amend the Plan and for an order confirming the Plan. On November 17, 1995, the bankruptcy court entered an order granting UCC's motion to amend the Plan and confirming it. *In re 183 Lorraine Street Assoc.,* Ch. 11 No. 194–17830–352 (Bankr.E.D.N.Y. Nov. 17, 1995). It is not clear from the record whether any of the parties informed the bankruptcy court that this court had issued a judgment ordering the Premises to be sold in a foreclosure sale.

## VI. The Sale

On November 22, 1995, the Premises were sold at a bankruptcy auction pursuant to the Plan. UCC purchased the Premises by a bid of $500,000 pursuant to the Plan and 11

---

**8.** UCC's re-removal resulted in the foreclosure action being assigned two adversary proceeding numbers. They were later consolidated as Adversary Proceeding Number 194–1434–352.

**9.** Section 1121(b) of 11 U.S.C. provides in pertinent part that "[O]nly the debtor may file a plan until after 120 days after the date of the order for relief under this chapter." The bankruptcy court entered an order for relief On November 17, 1994. Therefore, the debtor's exclusive period in which to file a plan expired on March 15, 1995.

**10.** Section 1121(c)(2) of 11 U.S.C. provides in part that "[A] creditor ... may file a plan if and only if ... the debtor has not filed a plan before 120 days after the order for relief under this chapter[.]"

**11.** Bankruptcy Rule 3016 provides in part:

... In a chapter 9 or 11 case, a disclosure statement pursuant to § 1125 or evidence showing compliance with § 1126(b) of the Code shall be filed with the plan or within a time fixed by the court.

**12.** Section 157(c)(1) of 28 U.S.C. provides that in proceedings that do not "arise under" Title 11 "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge[.]"

**13.** Section 1127(a) of 11 U.S.C. provides in pertinent part:

The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title[.]

U.S.C. § 363(k).[14] UCC assigned its successful bid to its wholly-owned subsidiary, Clinton–Bush Corporation. Appellee's Brief ("UCC Br.") 72.

UCC's decision to execute the Plan rather than to hold a foreclosure sale puzzled both this court and the bankruptcy court. On December 20, 1995, the following colloquy took place in the bankruptcy court:

> MR. MELLON: The bankruptcy sale took place, Your Honor.
>
> THE COURT: The foreclosure sale?
>
> MR. MELLON: The bankruptcy sale, Your Honor. We have a foreclosure judgment from Judge Glasser. It was docketed on the 14th of November. Your Honor confirmed the plan. You may remember that at the confirmation hearing we changed through our motion from a 363[15] Sale to a regular 1123[16] Sale. We sold the property at that point in time.
>
> THE COURT: There was no foreclosure sale. It was a 363 Sale.
>
> MR. FISCHER: No. Not 363, it was 1123.
>
> MR. MELLON: It was an 1123.

Tr. Dec. 20, 1995 at 10.

On January 19, 1996, Mr. Mellon informed this court that the Premises were not sold pursuant to a foreclosure sale. However, he was unresponsive when asked why:

> THE COURT: Because?
>
> MR. MELLON: A bankruptcy sale.
>
> THE COURT: What is the distinction between them?
>
> MR. MELLON: Your Honor, I was going on parallel tracks because I was being stopped in the foreclosure by litigation.

So when they put it into bankruptcy, 183 Lorraine Associates, the fee owner and the mortgagor, I was having a foreclosure action against them. I've gotten to the point where Your Honor is familiar with those proceedings. They put at the last moment 183 Lorraine Street into bankruptcy. I tried to proceed with the foreclosure action there.

> THE COURT: I had all that before me and I directed that the judgment of the state court be enforced, be respected; that the property, the mortgage can be foreclosed and the property sold.

Tr. Jan. 19, 1996, at 15.

On March 1, 1996, this court again asked Mellon why the property was not sold pursuant to the judgment of foreclosure and sale:

> THE COURT: ... Having a judgment of foreclosure from me, what prevented UCC from proceeding with the foreclosure sale pursuant to the state judgment?
>
> MR. MELLON: One thing I was going to correct Mr. Fischer during the discussions: You were asking Mr. Fischer in whom the title is right now. Am I correct it is not in 183 Lorraine Street. It has been sold on November 22nd of [19]95 at a bankruptcy auction to my client, who then assigned his contract to a subsidiary of his.
>
> THE COURT: And by virtue of that bankruptcy sale, all of the subordinate interests were extinguished.
>
> MR. MELLON: That is correct.[17]

Tr. Mar. 1, 1996 at 25.

If UCC had simply sold the Premises pursuant to this court's judgment of foreclosure and sale, the matter would be resolved by now. Unfortunately for UCC, the plan pur-

---

**14.** Section 363(k) of 11 U.S.C. provides in pertinent part:

> At a sale ... of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise *the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.*
> (emphasis added).

**15.** Section 363(b) of 11 U.S.C. provides for sale of property by the debtor or the trustee. Since

UCC was neither the debtor nor the trustee, UCC could not sell the Premises under Section 363(b).

**16.** Section 1123(b)(4) of 11 U.S.C. provides that a plan may:

> provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests[.]

**17.** Although this assertion is vigorously disputed by Fischer, it is not before the court at this time and is best left to the State Court to decide.

suant to which the Premises were sold was, in fact, unconfirmable.

## DISCUSSION

### I. Standard of Review

 This court reviews *de novo* the bankruptcy court's conclusions of law. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *In re Jamesway Corp.*, 179 B.R. 33, 35 (S.D.N.Y.1995). The bankruptcy court's findings of fact are reviewed for clear error. Bankruptcy Rule 8013.[18]

### II. Appeal 95–CV–5062

 This is an appeal from the bankruptcy court's October 18, 1995 order annulling the automatic stay retroactively to September 26, 1994 to enable UCC to prosecute the foreclosure action.

### Relief from the Automatic Stay

Section 362(d) of 11 U.S.C. provides in pertinent part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay ... such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > (A) the debtor does not have an equity in such property; and
> >
> > (B) such property is not necessary to an effective reorganization.

In some instances, courts have deemed a mortgagor's failure to pay real estate taxes or to keep the mortgaged premises insured "cause" for lifting the stay for lack of adequate protection. *See In re Heinzeroth,* 40 B.R. 518, 520 (Bankr.E.D.Pa.1984); *In re Ausherman,* 34 B.R. 393, 394 (Bankr.N.D.Ill. 1983).

Factors such as these are present in abundance. UCC has introduced evidence that Lorraine failed to obtain insurance on the Premises and did not pay real estate taxes. In addition, the circumstances of the filing and the failure of any of the original creditors to propose plans of reorganization strongly suggest that, as in many other single-asset cases, the "purpose in filing is not to reorganize, but to hold a single asset hostage." *See Pleasant Pointe Apartments, Ltd. v. Kentucky Housing Corp.,* 139 B.R. 828, 832 (W.D.Ky.1992). In such cases, relief from the automatic stay is an appropriate remedy. *See In re 266 Washington Assocs.,* 141 B.R. 275 (Bankr.E.D.N.Y.), *aff'd* 147 B.R. 827 (E.D.N.Y.1992).

This court holds that the bankruptcy court did not err in finding sufficient cause to annul the automatic stay. Accordingly, the bankruptcy court's order annulling the automatic stay to permit UCC to prosecute the foreclosure action is affirmed.

### III. Appeal 96–CV–119

 This is the joint appeal of FBI and Fischer from the bankruptcy court's November 14, 1995 order denying Fischer's August 10, 1995 motion to remove Turner from the office of the receivership. *In re 183 Lorraine Street Assoc.,* Ch. 11 No. 194–17830 (Bankr.E.D.N.Y. Nov. 14, 1995). Not only is this appeal moot, *see 183 Lorraine Street Assoc. v. United Capital Corp.,* No. 95–5094, 1996 WL 282122 (2d Cir. May 29, 1996) ("a receiver's duties end upon the sale of the subject property"), but it is questionable whether the bankruptcy court had jurisdiction of the underlying motion at all.

Between June 26, 1995 and October 26, 1995, there was an appeal pending before this court seeking *to reverse* an earlier bankruptcy court order *continuing* the receiver, *United Capital Corp. v. 183 Lorraine Street Assoc.,* DN 95–CV–3137 (E.D.N.Y.1995). Hence, there was no justifiable reason for Fischer to bring a motion on August 10, 1995 *to remove* the receiver. The appeal and the motion sought the same relief. In view of

---

**18.** Bankruptcy Rule 8013 provides in part:
 Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

the previous decisions of this court and the Court of Appeals for the Second Circuit, the appellants' stubborn refusal to withdraw the appeal of the denial of this redundant motion is frivolous. This court hereby dismisses this appeal on the ground of mootness.

### IV. Mootness

■ UCC's chief argument in opposition to the appeals in **95–CV–5348, 96–CV–818,**[19] and **96–CV–211** is that they are moot because a sale has taken place and distributions have been made under the Plan. UCC Br. 73. This court disagrees.

■ In general, a bankruptcy appeal is moot if: (1) an event occurs while an appeal is pending that makes it "impossible for a court to grant effective relief"; or (2) "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Best Products Co., Inc.*, 68 F.3d 26, 29–30 (2d Cir.1995).

UCC argues that relief is either impossible or inequitable because the Plan has been substantially consummated. However, although "[s]ubstantial consummation of a re-organization plan is a momentous event, ... it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." *In re Chateaugay Corp.*, 10 F.3d 944, 952–53 (2d Cir.1993); *see also In re Seidler*, 44 F.3d 945, 947 n. 3 (11th Cir.1995) ("[e]ven if substantial consummation has occurred, a court must still consider all the circumstances of the case to decide whether it can grant effective relief.").

The Second Circuit has set forth five circumstances that must be present for a court to consider a bankruptcy appeal after substantial consummation of a plan:

1. The court can still order some effective relief;

2. Such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

3. Such relief will not unravel intricate transactions so as "to knock the props out

from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court";

4. The "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings"; and

5. The appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."

*Chateaugay*, 10 F.3d at 952–53. Each factor is discussed in turn.

First, UCC contends that effective relief is impossible because the Premises have been sold pursuant to the Plan, and UCC has already invested over $630,000 to pay New York City tax arrears, priority claims, and unsecured creditors under the Plan. Appellee's Brief at 74–77. However, the distributions made under the Plan were relatively simple and well documented. A reversal would require only that, as a condition of relief, a prevailing appellant reimburse UCC for the monies paid in satisfaction of the New York City taxes and all other claims. Therefore, effective relief is not "impossible."

The second factor actually militates in favor of consideration of the appeals. Since the debtor's sole asset was sold under the Plan, re-emergence of the debtor would be impossible if the appeals were dismissed as moot, as UCC urges.

The third factor does not present a great impediment because the Premises are subject to the judgment of this court, affirmed by the Second Circuit, ordering foreclosure and sale of the Premises. Whether the bankruptcy sale is permitted to stand or whether the Premises must be re-sold pursuant to the judgment of foreclosure and sale, there will be little left for the bankruptcy court to decide.[20]

---

**19.** Although this motion was made in May 1995, the bankruptcy court's order denying it was not entered until December 1995.

**20.** This is an issue best left to the State Court to decide.

The fourth factor is present, since all relevant parties are before the court on these appeals and have briefed the issues.

The fifth factor articulated under *Chateaugay* presents the most difficult issue. The requirement that the appellant "pursue[d] with diligence all available remedies to obtain a stay" is modified by the phrase *"if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."* UCC argues that Fischer's failure to obtain a stay of the bankruptcy sale would "render it inequitable" for this court to consider the appeal from the confirmation order.

However, the Second Circuit has recently held that an appellant's failure to obtain a stay does not automatically render a subsequent appeal moot. *See In re Best,* 68 F.3d 26 (2d Cir.1995). In *Best,* Resolution Trust Corporation ("RTC") challenged the bankruptcy court's jurisdiction to enforce a subordination agreement. *Id.* at 28. The bankruptcy court denied RTC's challenge and confirmed a plan that incorporated the subordination agreement. *Id.* at 28–29. RTC appealed to the district court the order enforcing the subordination agreement but did not seek a stay of the confirmation order or of consummation of the plan. The district court declined to address the merits of the appeal, and dismissed it as moot. *Id.* at 29. The Court of Appeals for the Second Circuit implicitly rejected the appellee's contention of mootness and instead exercised its plenary power to review the bankruptcy court's order on the merits, writing:

> Giving the RTC the benefit of every doubt, it is at least conceivable that RTC's appeal was not moot. Because we believe that the issue of mootness is a more difficult question than the issue of the bankruptcy court's jurisdiction, and because the latter issue is clear-cut and relatively simple, sound judicial administration suggests that we decide it on the merits.

*Id.* at 30.

Such a result comports with the approach taken by other circuits. *See, e.g., City of Covington v. Covington Landing Limited Partnership,* 71 F.3d 1221, 1225–26 (6th Cir. 1995) ("The failure to seek a stay ... is not necessarily fatal to the appellant's ability to

proceed."); *In re Manges,* 29 F.3d 1034, 1040 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995); *In re UNR Industries,* 20 F.3d 766, 769–70 (7th Cir.) (the failure to seek a stay is not "a censurable event to be punished by refusal to adjudicate the merits"), *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994); *In re Club Assoc.,* 956 F.2d 1065 (11th Cir. 1992) ("the absence of a stay does not compel a finding of mootness in all cases."); *In re Sun Valley Ranches, Inc.,* 823 F.2d 1373, 1375 (9th Cir.1987) ("a debtor's failure to obtain a stay ... followed by the sale of the debtor's property, did not moot the debtor's subsequent appeal because the creditor-purchaser was before the court"); *In re AOV Industries Inc.,* 792 F.2d 1140, 1147 (D.C.Cir. 1986).

On reviewing all relevant factors, this court concludes that it would not be inequitable to adjudicate these appeals. All of the affected parties are before this court. There is no innocent third-party purchaser that would be prejudiced by reversal or modification. The events that led to the alleged mootness were completely within the appellee's control. Most importantly, *UCC had a perfectly valid opportunity to execute the judgment of foreclosure and sale granted by this court on November 8, 1995.* This court does not find UCC's own decision to ignore that order a compelling factor weighing against consideration of these appeals. Thus, this court concludes that the fifth factor in *Chateaugay* is satisfied.

For all of the above reasons, as well as the general prudential principle that it is more desirable to decide cases on the merits, this court holds that its "duty to review a bankruptcy court's confirmation order," *see In re Club,* 956 F.2d at 1070 n. 13, warrants consideration of these appeals. The appellee's mootness argument is rejected.

### V. *Appeal 96–CV–818*

▇ This is an appeal from an order denying a May 15, 1995 motion by Fischer seeking the following relief:

1. An order pursuant to 11 U.S.C. § 506(a) determining the extent to which

UCC's and Joseph Nathanson's claims were secured and to what extent unsecured;

2. A determination that UCC and Nathanson could not elect fully secured treatment of their claims under 11 U.S.C. § 1111(b)(2); and

3. An order pursuant to Bankruptcy Rule 3013 and 11 U.S.C. § 1122 to determine the classification of claims secured by the Premises.

Designation 96–CV–818 No. 4.

A hearing was held on this motion on July 27, 1995. On December 12, 1995, the bankruptcy court entered an order denying this motion in all respects. Each branch of the relief requested in the motion will be discussed in turn.

### *Characterization of Claims*

■ 11 U.S.C. § 501(a) provides that upon the filing of a bankruptcy petition a creditor may file a proof of claim. The creditor must indicate the amount of the claim and the extent to which it is secured or unsecured. A properly filed proof of claim is *prima facie* evidence of the amount and character of the claim. It is deemed allowed absent objection. 11 U.S.C. § 502(a).

Section 506(a) of 11 U.S.C. provides in pertinent part:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... *is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such* allowed claim. [.]

(emphasis added).

"Subsection (a) of § 506 provides that a claim is secured *only to the extent of the value of the property on which the lien is fixed;* the remainder of that claim is considered unsecured." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989) (emphasis added).

"There can be a 'secured claim' in excess of collateral ... in a plan, but there cannot be an *'allowed secured claim'* in excess of the value of the collateral." *In re BBT,* 11 B.R. 224, 231 (Bankr.D.Nev.1981) (emphasis added). Claims in excess of the value of property securing them are "undersecured." The unsecured portion of an undersecured claim is a "deficiency claim" and is substantially similar to any other unsecured claim.

A simple example will illustrate the proper treatment of undersecured claims. In *In re Spectee Group, Inc.,* 185 B.R. 146 (Bankr. S.D.N.Y.1995), a creditor had claims of $840,000 that were secured by property of the estate valued at $300,000. The court properly held that the creditor had a secured claim of $300,000 and a deficiency claim of approximately $540,000. *Id.* at 150.

Obviously, some estimate of the value of the property securing a claim is required in order to determine the extent to which an undersecured claim is secured and the extent to which it is unsecured. To that end, Bankruptcy Rule 3012 provides:

*The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.*

(emphasis added).

■ The valuation of a claim secured by property necessarily requires a valuation of the property securing such a claim. "If an objection is made to the proof of claim, *the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.*" *In re Harrison,* 987 F.2d 677, 680 (10th Cir.1993) (emphasis added) (*citing In re Padget,* 119 B.R. 793, 798 (Bankr.D.Colo. 1990)). In *Harrison,* the court distinguished the burden of *seeking* a value determination under Bankruptcy Rule 3012 from the creditor's ultimate *burden of persuasion,* writing:

While Agricredit [an undersecured creditor] ... would have an unsecured claim for the amount by which its claim exceeds the value of the collateral ... [i]f an objection had been filed, Agricredit would have had

the burden of persuasion as to the validity and amount of the claim.

*Id.,* at 681.

In its October 14, 1994 proof of claim, UCC listed the claim under the UCC Note and Mortgage as a $1,074,597.80 *secured* claim. Designation 96–CV–818 No. 4 Exh. L. In its October 26, 1994 proof of claim, UCC listed the claim under the CrossLand Note and Mortgage as a $4,138.863.90 *secured* claim. Designation 96–CV–818 No. 4 Exh. M.·

UCC's two proofs of claims were combined as one secured class of $5.2 million under the Plan. Fischer objected, claiming that this characterization and classification violated Sections 506(a) and 1111(b) of 11 U.S.C. Fischer demanded a hearing pursuant to Bankruptcy Rule 3012 to determine the amount and character of UCC's and Nathanson's claims.

A valuation hearing was held on July 25, 1995. The bankruptcy court denied Fischer's motion for determination of value, stating:

> THE COURT: I never get to [UCC']s objections until you first establish your burden. You have the initial burden of proof, being that you have to first prove what the value is. I don't have to address his objections until after you've done that.

Tr. July 25, 1995 at 66.

Since Fischer objected to the fully secured characterization of UCC's $5.2 million claim, UCC had the burden of persuasion as to the validity and amount of its claim. *See Harrison,* 987 F.2d at 680. Doing so would have necessitated some estimate of the value of the Premises. Therefore, the denial of Fischer's motion to determine a value for the Premises was erroneous. The portion of the bankruptcy court's order denying Fischer's motion seeking to value the Premises and to bifurcate UCC's and Nathanson's claims into secured and unsecured components is hereby reversed.

### Election of Fully Secured Status

██ As another branch of his May 15, 1995 motion, Fischer moved the bankruptcy

court "for a determination that United Capital Corp. . . . may not elect the application of paragraph (2) of § 1111(b) of the Code." Designation 96–CV–818 No. 4 at 2–3.

Section 1111(b)(2) of 11 U.S.C. provides in pertinent part:

> If an election [under this paragraph] is made, then notwithstanding section 506(a) of this title, *[an undersecured] claim is a secured claim to the extent that such claim is allowed.*

(emphasis added).

██ The purpose of the section 1111(b)(2) election is to protect secured creditors from depreciations in the market value of property securing claims. Otherwise, mortgagors could reduce their mortgage obligations during market contractions by filing Chapter 11 reorganization petitions, obtaining depressed valuations of their mortgaged property, giving mortgagees the cash equivalent of the secured portion of their claims, and treating the deficiency claims the same as the claims of other general unsecured creditors generally by giving them a small *pro rata* percentage distribution. Section 1111(b)(2) protects mortgagees from this type of opportunism by giving them the option of maintaining the fully secured nature of their claims in case the mortgaged property is retained by the debtor after reorganization. *See In re 680 Fifth Avenue Assocs.,* 29 F.3d 95 (2d Cir. 1994).

UCC appeared to elect the application of 11 U.S.C. § 1111(b)(2) because the Plan classified UCC's entire $5.2 million claim as a single, secured claim. However, 11 U.S.C. § 1111(b)(1)(B)(ii) provides in pertinent part:

> A class of claims *may not elect application of paragraph 2 of this subsection if—*
>
> . . . the holder of a claim of such class *has recourse* [21] *against the debtor* on account of such claim and *such property . . . is to be sold under the plan.*

The reason that the holder of an undersecured claim cannot elect fully secured status under a plan that calls for the sale of his

---

**21.** UCC had "recourse against the debtor" because the debtor was a single-asset real estate holding company and because it held personal

guarantees from Irving and Leah Goldstein for the full amount of the mortgage debt.

collateral is *"because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k)[.]"* 124 Cong.Rec. H11, 103–104 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,420 (daily ed. Oct. 6, 1978) (emphasis added).

The Plan called for the Premises to be sold at a bankruptcy auction pursuant to 11 U.S.C. § 1123(b)(4).[22] Therefore, UCC clearly was *not* entitled to elect fully secured status. See 11 U.S.C. 1111(b)(2)(B)(ii). The bankruptcy court's order denying Fischer's motion for a determination that UCC was ineligible to elect fully secured status under 11 U.S.C. § 1111(b)(2) was erroneous and is hereby reversed.

### Classification of Claims and Appeal 95–CV–5348

■ The last branch of Fischer's May 15, 1995 motion objected to the classification of claims and interests under UCC's disclosure statement and the Plan. The order appealed in **95–CV–5348,** which approved UCC's disclosure statement, concerns the same issues. Therefore, they are discussed together.

As part of the confirmation process, the proponent of a plan of reorganization circulates to creditors a statement (the "disclosure statement") describing the treatment of their claims under the proposed plan. The purpose of the disclosure statement is to classify claims into groups and to enable these groups of creditors to be fully informed when voting whether or not to accept a proposed plan.

■ A fundamental principle of classification is that similar claims must be classed together. Section 1122(a) of 11 U.S.C. provides:

... [A] plan may place a claim or an interest in a particular class *only if such claim or interest is substantially similar to the other claims or interests of such class.*

(emphasis added).

■ In general, secured claims cannot be classified with unsecured claims. *See, e.g., In re Bjolmes Realty Trust,* 134 B.R. 1000, 1002 (Bankr.D.Mass.1991). In the case of an undersecured creditor, the deficiency claim is an unsecured claim which cannot be placed in the same class as the secured portion of the undersecured creditor's claim.[23] *See In re D & W Realty Corp.,* 165 B.R. 127, 129 (S.D.N.Y.1994) ("Manifestly, a secured claim and an unsecured claim, even those of the same creditor, are about as dissimilar as two claims can be.").

■ Moreover, the deficiency portion of an undersecured creditor's claim must be classified with other unsecured claims, absent a compelling business reason to the contrary. *See In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir.1994); *D & W Realty,* 165 B.R. at 130 ("separate classification of unsecured deficiency claims and other unsecured claims ... may be permitted only for legitimate business or Code-based reasons").

■ The purpose of the requirement that a deficiency claim be classified with other unsecured claims is "to allow the undersecured creditor a right to potentially dominate the vote within the unsecured class."[24] *In re 500 Fifth Avenue Assoc.,* 148 B.R. 1010, 1021 (Bankr.S.D.N.Y.), *aff'd,* 1993 WL 316183 (S.D.N.Y.1993). "[I]f claims could be arbitrarily placed in separate classes, it would almost always be possible for the [proponent of a plan] to manipulate 'acceptance' by artful classification." *In re Greystone III Joint Venture,* 995 F.2d 1274, 1277 (5th Cir.1991), *cert. denied,* 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *see also In re Bryson Properties,* 961 F.2d 496, 502 (4th Cir.), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) (holding that separate

---

22. Section 1123(b)(4) of 11 U.S.C. provides that a plan may:

provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests[.]

23. A narrow exception to this rule exists, but it is not available if the property is to be sold under the plan. (See discussion under "Election of Fully Secured Status," above).

24. See discussion under "Voting," below.

classification was "clearly for the purpose of manipulating voting and it may not stand").

The Plan provided for the following classes of claims:

1. Class I: Unpaid pre-petition New York City real estate tax, water, and sewer charges of approximately $397,422.93.

2. Class II: UCC's claims under the first and second mortgages on the Premises, as well as the amount of fees owed by UCC to the Receiver. The total in claims under the mortgages were estimated at over $5.2 million and the receiver's fees were estimated to be $70,000.

3. Class III: Joseph Nathanson's junior secured claim pursuant to a mortgage, which was estimated to be $404,000.

4. Class IV: Allowed Priority Claims under 11 U.S.C. § 507(a)(2)–(7) from the New York City Environmental Control Board, the IRS and the New York City Fire Department for $4,000, $1,647.95, and $3,000, respectively.

5. Class V: Unsecured Claims of general creditors, including Fischer, FBI, and Kin Chi Plumbing & Heating.

6. Class VI: Holders of equity interests in Lorraine.

The Plan called for the sale of the Premises. Class I and IV claims would be paid in full in cash from proceeds of the sale. The rest of the sale proceeds and the cash in the receiver's account would go to Class II, less $5,000, which would be divided *pro rata* among Class V. The Plan further provided:

In the event the proceeds of the sale are insufficient to satisfy the Class II Claim, the Holder of the Class II Claim shall have a Class V claim for the unsatisfied amount.

Designation 96–CV–211 Exh. 3.

Since UCC was not entitled to make an election of fully secured status under 11 U.S.C. § 1111(b)(2), its claim should have been bifurcated into secured and unsecured components. The unsecured component (the "deficiency claim") should have been classified with other unsecured claims. The bank-

ruptcy court's order approving the disclosure statement which permitted UCC to classify claims in violation of 11 U.S.C. § 1122(a) was legally erroneous. The order appealed in **95–CV–5348** is hereby reversed. The portion of appeal **96–CV–818** pertaining to the same issue is dismissed as redundant.

### VI. Appeal 96–CV–211

 This is an appeal of the bankruptcy court's November 17, 1995 order confirming UCC's Second Amended Plan of Reorganization (the "Plan").

### Impaired Claims

An important principle of bankruptcy reorganization is the protection of the holders of impaired claims. A claim is "impaired" under a plan unless the plan:

(1) *leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim* or interest;

. . . *or*

(3) *provides that, on the effective date of the plan, the holder of such claim or interest receives,* on account of such claim or interest, *cash equal to—*

(A) with respect to a claim, *the allowed amount of such claim* [.]

11 U.S.C. § 1124 (emphasis added).

The provisions of section 1124 are disjunctive. Thus, a claim is impaired· only if *neither* of the subsections of 11 U.S.C. § 1124 apply.

If a plan of reorganization impairs the rights of one or more classes of claims, then the plan *cannot* be confirmed unless at least one impaired class of claims has accepted the plan. See 11 U.S.C. § 1129(a)(10).[25]

UCC proposed Class II as the impaired class that had accepted the Plan. UCC reasoned that Class II was impaired because "the holder of Class II Claims will receive less than the full amount of its Allowed

---

**25.** Section 1129(a)(10) provides as a condition of confirmation:

*If a class of claims is impaired* under the plan, *at least one class of claims that is impaired* under the plan *has accepted the plan,* determined without including the acceptance of the plan by any insider.
(emphasis added).

Claims," which it had claimed to be in excess of $5.2 million.

UCC's reasoning was erroneous for at least two reasons. First, if UCC's claim entitled it to the equitable remedy of foreclosure *in lieu of* a legal claim for the face amount of the debt, then any plan that gave UCC title to the Premises would leave that claim unimpaired. See 11 U.S.C. § 1124(1) (A claim is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest").

Second, the determination of whether UCC would, in fact, receive less that the face value of its mortgages was not ascertainable until after consummation of the Plan. Therefore, it was impossible to say, as a matter of law, that Class II (UCC) was "impaired" under the Plan.

> Treatment of Class II was as follows:
> Class II Allowed Secured Claims shall be satisfied through the sale of the Property.... *UCC shall receive the Net Proceeds from the sale of the Property,* provided however, that ... $5,000 shall be set aside from the sale proceeds and placed in escrow to be held by [counsel for UCC], for payment of up to 20% of the Allowed Amount of Class V Claims.... [I]n the event UCC makes a successful credit bid, then in that event ... UCC shall be required to deposit the sum of, up to, $5,000 in escrow to be held by [counsel for UCC] for payment of creditor claims herein.... *UCC shall also receive the cash held by the Receiver, on the Effective Date if any* [.]
> Designation No. 3 at 12 (emphasis added).

The Plan also provided for the alternative possibility that UCC was undersecured:

> In the event the proceeds of the sale are insufficient to satisfy the Class II Claim, the Holder of the Class II Claim shall have a Class V claim for the unsatisfied amount.[26]

Under the Plan, one of three things could happen: (1) An outside bidder could purchase the Premises for *less* than the amount

of the outstanding mortgage debt and UCC would receive the proceeds and the money in the receivership account minus $5,000; (2) UCC could credit bid for the Premises, take title to the Premises, and receive the money in the receivership account minus $5,000; or (3) an outside bidder could purchase the Premises for *more* than the amount of the outstanding mortgage debt, Class II's claim would be paid in full, and UCC would also receive the money in the receivership account.

In the first two hypothetical scenarios, Class II would be impaired, because UCC would receive $5,000 less than it would ordinarily have received under its mortgage. However, in the third hypothetical scenario, UCC would receive all that it would have received in a mortgage foreclosure and perhaps more.

However unlikely it may have been that Class II's claim would have been satisfied through sale of the Premises, such a determination could not have been made until after the value of the Premises was established. Since such an event could only occur *after* confirmation of the Plan, this court cannot say that, as a matter of law, Class II was "impaired" under the Plan.

Moreover, the degree to which Class II would have been impaired was minimal. Courts within this circuit have looked with disfavor upon the "artificial" impairment of claims: *See, e.g., In re Fur Creations,* 188 B.R. 754, 760 (Bankr.S.D.N.Y.1995) ("There must be a showing that the proposed impairment is necessary for economical or other justifiable reasons and not just to achieve 'cram down' ") (denying confirmation).

### Cramdown

UCC erroneously believed that it had successfully utilized the cramdown provision of the Code, 11 U.S.C. § 1129(b)(1), to force acceptance of the Plan on the other creditors. That provision provides in pertinent part:

> ... [I]f all of the applicable requirements of subsection (a) of this section other than

---

26. Given that UCC's deficiency claim would have constituted the overwhelming majority in dollar amount of Class V, its pro rata share of any Class V distribution would have accounted for virtually all of any such distribution.

*paragraph (8)* [27] *are met with respect to a plan, the court . . . shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

(emphasis added).

Notably, the plain language of the statute provides no exception for 11 U.S.C. § 1129(a)(10). As the authorities acknowledge,

> Section 1129(a)(10) requires the approval of at least one impaired class of claims. Thus, *section 1129(a)(10) prevents using section 1129(b) to obtain confirmation of a plan which . . . has not been accepted by any [impaired] class.*

5 Collier on Bankruptcy ¶ 1129.03[d] (1995) (emphasis added). In fact, one of the purposes of the Bankruptcy Amendments and Federal Judgeship Act of 1984 was "to prevent recourse to the 'cram-down' powers of section 1129(b) in circumstances where no impaired class of claims has accepted the plan." 5 Collier ¶ 1129.02[10] at 1129–59; *see also In re Fur Creations,* 188 B.R. at 758 (citing cases).

Since Class II was not definitely "impaired," another impaired class of claims would have had to accept the Plan in order to satisfy Chapter 11's required that at least one impaired class of claims accept the Plan. See 11 U.S.C. § 1129(a)(10). Such an acceptance could have come only from Class V, the class to which Fischer and FBI belonged.

*Voting*

In order for a class to accept a plan, two-thirds in amount *and* one-half in number of claims within a class must vote to accept it. 11 U.S.C. § 1126(c).[28] These requirements are conjunctive. *See In re Boston Post Road Ltd. Partnership,* 154 B.R. 617, 620 (D.Conn. 1993) ("A class approves a plan if *more than one half of the holders representing at least two-thirds of the interests* in the class favor the plan.") (emphasis added).

Assuming that UCC's mortgage debt exceeded the value of the Premises, UCC would have had an unsecured Class V claim for that amount. However, although UCC's economic dominance of Class V would have allowed it to *veto* a plan it opposed, but did not allow it to force the unsecured class to *accept* the Plan. 11 U.S.C. § 1126(c). Although UCC dominated the unsecured class in *amount,* it could not achieve *numerical* dominance. Once FBI and Fischer cast their inevitable negative votes, Class V would not be able to accept the Plan, and thus no impaired class of claims would have accepted the Plan.[29]

In light of the foregoing, this court concludes that the Plan was unconfirmable as a matter of law and that UCC erroneously invoked the cramdown provision to force acceptance of the Plan over the objections of FBI and Fischer. The bankruptcy court order confirming the Plan is hereby reversed.[30]

## VII. Abstention and Remand

Section 1334(c)(1) of 28 U.S.C. provides:

> Nothing in this section prevents a district court in the interest of justice, or in the

---

**27.** Section 1129(a)(8) of 11 U.S.C. provides:
With respect to each class of claims of interests—
(A) such class has accepted the plan; or
(B) such class in not impaired under the plan.

**28.** Section 1126(c) of the Code provides in pertinent part:
A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least *two-thirds in amount and more than one-half in number* of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.

**29.** Fischer, FBI, and a number of other creditors in fact voted against the Plan.

**30.** Whether the Plan was also "fair and equitable" with respect to the class of unsecured creditors would be the next level of analysis. Much has been written on this perhaps most nebulous area of Chapter 11 reorganization. Although this decision does not reach the issue of the "fair and equitable" requirement of cram-down, this court recognizes that the Plan's unorthodox treatment of Class II would raise genuine issues under that requirement.

interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Under 28 U.S.C. § 1452(b), a district court to which a claim or cause of action has been removed may remand it on "any equitable ground."

Courts generally consider the following factors in deciding whether to remand a case based on their discretionary authority to abstain: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntary removed defendants. *See Drexel Burnham Lambert Group, Inc. v. Vigilant Insurance Co.*, 130 B.R. 405, 407 (S.D.N.Y.1991).

When applied to the facts of this case, these equitable factors favor remanding the foreclosure action to the State Court. This court has long been puzzled by UCC's decision to pursue a bankruptcy reorganization after this court granted it a judgment of foreclosure and sale last November.

## VIII. Dismissal of the Chapter 11 Case

▮ Section 1112(b) of 11 U.S.C. provides in pertinent part:

[O]n request of a party in interest or the United States trustee, and after notice and a hearing, *the court* may convert a case under [Chapter 11] to a case under chapter 7 of this title or *may dismiss a case under this chapter,* whichever is in the best interest of creditors and the estate, *for cause,* including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and a denial of a request made for additional time for filing another plan or modification of a plan[.]

. . . .

(emphasis added).

As originally drafted in 1977, Section 1112 permitted a court to convert or dismiss a bankruptcy petition only upon motion of a party to the case. *See In re Gusam Restaurant Corp.*, 737 F.2d 274 (2d Cir.1984); *In re Tiana Queen Motel, Inc.*, 749 F.2d 146 (2d Cir.1984), *cert. denied,* 471 U.S. 1138, 105 S.Ct. 2681, 86 L.Ed.2d 699 (1985).

However, in 1986, the Bankruptcy Code was amended to add the following sentence to 11 U.S.C. § 105(a):

.. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent abuse of process.

Pub.L. No. 99–554 (1986).

The leading bankruptcy treatise has commented that in light of the 1986 amendment "it would appear that the bankruptcy judge may convert or dismiss a case *sua sponte* even though section 1112 explicitly requires that the request be made by a party in interest." 5 Collier on Bankruptcy ¶ 1112.03[4] (15th ed. 1996).

Although the Court of Appeals for the Second Circuit has not, since the 1986 amendment, explicitly ruled on whether a court may *sua sponte* dismiss or convert a bankruptcy case, it has "repeatedly emphasized the importance of the bankruptcy court's equitable power" and stressed that a court

may sift the circumstances surrounding any claim in order to ascertain that injustice or unfairness is not accomplished in the administration of the debtor's estate and in so doing it may adopt that remedy

which it deems most appropriate under the circumstances.

*In re Momentum Manufacturing Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994) (citations omitted).

Lower courts within this circuit have adopted *sua sponte* dismissals as appropriate remedies for insuring that "injustice or unfairness is not accomplished." *See, e.g., In re Klenosky*, 130 B.R. 132, 134–35 (E.D.N.Y. 1991) ("the continued viability of *In re Gusam Restaurant* is called into question by the 1986 amendment to section 105(a) of the Code."); *In re 266 Washington Assocs.*, 141 B.R. 275, 281 (Bankr.E.D.N.Y.) (dismissing case and holding that "confirmation of a reorganization plan in the near future" was not "within the realm of possibility."), *aff'd* 147 B.R. 827 (E.D.N.Y.1992). Courts in other circuits have also approved *sua sponte* dismissals. *See e.g., Hayes v. Production Credit Assoc. of the Midlands*, 955 F.2d 49, 1992 WL 26785 **3 (10th Cir.1992); *In re SB Properties, Inc.*, 185 B.R. 206, 208 (Bankr. E.D.Pa.1995).

The traditional standard for dismissing a chapter 11 petition is "for cause," which may include the factors listed in Section 1112(b). *See In re Trident Assoc. Ltd. Partnership*, 52 F.3d 127, 131 (6th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 188, 133 L.Ed.2d 125 (1995); *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). Several of these factors are present. The debtor has never proposed a plan of reorganization, nor is it likely to do so. The circumstances of this petition and the others related to it suggest that it was filed in order to frustrate UCC's foreclosure on the Premises. *See In re French Bourekas Inc.*, 175 B.R. 517 (Bankr.S.D.N.Y.1994); *In re French Bourekas Inc.*, Ch. 11 No. 95–B–21955 (S.D.N.Y. Dec. 6, 1995).

The extent to which this case displays an "abuse of process" has been clearly set out in the foregoing discussion. It certainly rises to the level contemplated by the drafters of the revised Section 105(a). The mortgagee has waited long enough to foreclose on the Premises and should no longer be held hostage in the bankruptcy court. In light of this court's reversal of the above orders and the inevitable reversal of all subsequent orders issued in reliance upon the confirmation order, this Chapter 11 case, *In re 183 Lorraine Street Assoc.*, Ch. 11 No. 194–17830–352 (Bankr.E.D.N.Y.), is hereby dismissed and the foreclosure action, *United Capital Corp. v. 183 Lorraine Street Assoc. et al.*, Adversary Proceeding No. 194–1434–352 (Bankr. E.D.N.Y.), is hereby remanded to the State Court.

## CONCLUSION

For the reasons above, this court dismisses appeal **96–CV–119**, affirms the order appealed in **95–CV–5062** and reverses the bankruptcy court orders appealed in **95–CV–5348**, **96–CV–211** and **96–CV–818**. Lorraine's Chapter 11 case is dismissed and the foreclosure action is remanded to the State Court.

SO ORDERED.