### In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

### The LTV CORPORATION, LTV Steel Company, Inc., BCNR Mining Corporation and Nemacolin Mines Corporation, Appellants,

### v.

### The AETNA CASUALTY AND SURETY COMPANY, National Fire Insurance Company of Hartford and the Commonwealth of Pennsylvania, Appellees.

### No. 93 Civ. 4578 (MBM).

United States District Court, S.D. New York.

May 5, 1994.

---

Mitchell A. Karlan, James P. Ricciardi, Robin L. Baker, W. James Hall, Gibson, Dunn & Crutcher, New York City, Larry L. Simms, Gibson, Dunn & Crutcher, Washington DC, Lorraine M. Weil, G. Eric Brunstad, Hebb & Gitlin, P.C., Hartford, CT, for appellants.

Richard S. Toder, Neil E. Herman, Jay Teitelbaum, Zalkin, Rodin & Goodman, New York City, for appellee Nat. Fire Co. of Hartford.

Karen E. Wagner, Davis Polk & Wardwell, Michael J. Crames, Edmund M. Emrich, Arlene Alves, Kaye, Scholer, Fierman, Hays & Handler and M. William Munno, James F.X. Hiler, Seward & Kissel, New York City, for appellees LTV Corp. and LTV Steel Co.

## OPINION AND ORDER

MUKASEY, District Judge.

Appellant Aetna Casualty and Surety Company appeals from an order of the Bankruptcy Court for the Southern District of New York approving a settlement (the "Settlement Order") among the National Fire Insurance Company of Hartford ("National Fire"), the Bureau of Workers' Compensation, Department of Labor and Industry of the Commonwealth of Pennsylvania (the "Bureau"), and the LTV Corporation, LTV Steel Company, Inc., BCNR Mining Corporation, and Nemacolin Mines Corporation (collectively, the "Debtors"). For the reasons set forth below, the Settlement Order is modified.

## I.

The relevant facts are straightforward and undisputed: On October 23, 1983, National Fire issued a surety bond in the sum of $7 million (the "National Fire Bond") in favor of the Bureau, which the Bureau could draw upon if Debtors defaulted on workers' compensation claims. (R.Ex. D–1 at 2) The National Fire Bond covered, among other things, workers' compensation claims arising "prior to [its] effective date." (R.Ex. D–3 ex. A) Although the termination date for the National Fire Bond was October 23, 1984, the bond provided that "termination shall not relieve the Surety of liability for the obligations of the Principal arising from injuries and occupational diseases that occur prior to ... such termination." (R.Ex. D–3 ex. A at ¶ 2)

On July 1, 1985, Aetna issued a surety bond in the sum of $27 million on behalf of the Debtors and in favor of the Bureau (the "Aetna Bond"). (R.Ex. CD–3 at 11–12) The Aetna Bond covered workers' compensation claims arising prior to its effective date (R.Ex. D–3 ex. C ¶ 1), but provided that the "Surety shall not be liable for any obligations of the Principal otherwise payable under a[ ] ... prior duly accepted Surety bond" (R.Ex. D–3 ex. C ¶ 1), such as the National Fire Bond.

In July 1986, Debtors filed for bankruptcy, and, shortly thereafter, informed the Bureau that they would not meet their obligations to pay workers' compensation claims. (R.Ex. D–1 stip. at 2) The Bureau then demanded payment from Debtors' sureties, including National Fire and Aetna. National Fire and Aetna initially contested liability to Debtors and the Bureau, and, in November 1988, National Fire commenced an action against the Bureau in Pennsylvania state court seeking a declaration that it was not liable under its bond for workers' compensation claims that arose prior to the bond's effective date. (Ex. D–1 Applic. at 3) In December 1988, Debtors commenced an adversary proceeding in the bankruptcy court seeking a declaration that National Fire was liable for claims arising prior to the National Fire Bond's effective date, and that Aetna was liable under the Aetna bonds. (R. D–1 at ¶ 7)

On July 2, 1990, Debtors, National Fire, and the Bureau settled bankruptcy court and the Pennsylvania state court proceedings (the "Settlement"). (R. Ex. D–1 at 5) The Settlement provided, among other things, that National Fire place $4.4 million into an interest bearing escrow account, which was to be paid to Debtors upon court approval of the Settlement. The Settlement provided further that "[u]pon payment of the Settlement Amount ... National Fire shall be automatically deemed released and discharged in full by the Bureau, the Debtors, all Claimants and every other person, entity, governmental unit or agency or party having or claiming right, whether directly or indirectly, under the National Fire Bond or otherwise with respect to any and all claims, duties, liabilities or obligations whatsoever in connection with the National Fire Bond." (R.Ex. D–1 ¶ 9) This clause accordingly released National Fire from all claims based on the National Fire Bond, including those asserted by parties such as Aetna that did not sign, or otherwise consent to, the Settlement.

In March 1993, shortly after filing their reorganization plan, Debtors filed an application with the bankruptcy court seeking approval of the Settlement. (R.Ex. D–1) Aetna objected and claimed at a hearing held on May 19, 1993 (the "May 19 Hearing") that it was a co-surety with National Fire pursuant to the clause in the Aetna Bond releasing Aetna from liability on prior surety bonds. Aetna argued that approval of the Settlement and a discharge of National Fire would impair Aetna's rights as a co-surety or subsurety of Aetna. Aetna argued that it had recently commenced an action against National Fire in Connecticut state court, seeking, among other things, contribution and indemnification from National Fire on workers' compensation claims that allegedly were covered under the National Fire Bond, but were paid by Aetna. (R.Ex. D–3 at 5) Indeed, in the action currently pending in Connecticut, National Fire has raised affirmative defenses of *res judicata*, waiver, and release based upon its discharge in the Settlement Order.

At the end of the hearing, Bankruptcy Judge Lifland signed the Settlement Order endorsing the Settlement as submitted. (R.Ex. D–5) On May 21, 1993, Aetna made a motion for a stay of the Settlement Order,

which Judge Lifland denied. (R.Ex. D–6 at 13–14) Aetna then moved in the District Court for the Southern District of New York for a stay pending appeal, which was denied also. (R.Ex. D–7) Aetna requests in this appeal that this court either remand the Settlement Order to the Bankruptcy Court for clarification, modify the terms of the Settlement Order so as not to extinguish Aetna's claims against National Fire, or reverse the Settlement Order.

## II.

As a threshold matter, appellees assert that Aetna's appeal is moot. Appellees argue that because the Settlement and the Plan have been substantially consummated, they cannot be undone now. It is true that the parties to the Settlement have made the requisite payments to, and dismissed their claims against, each other. In addition, the Plan has been consummated in that Debtors have emerged from bankruptcy. However, as the Second Circuit recently held in *Chateaugay Corp. v. LTV Steel Co.*, 10 F.3d 944, 952 (2d Cir.1993), a decision on a separate appeal of the underlying bankruptcy proceeding, "substantial consummation ... does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." *See also In re Texaco Inc.*, 92 B.R. 38, 46–47 (S.D.N.Y.1988) (" 'Substantial consummation' in the absence of a stay ... does not automatically discharge this court of its appellate jurisdiction.") Rather, a court must weigh case-specific factors to determine whether the requested relief is moot. The factors that determine mootness of a bankruptcy appeal include: (1) whether the court can fashion some effective relief; (2) whether the relief will adversely affect the debtor's reemergence pursuant to the plan; (3) whether the relief will unravel or otherwise make unmanageable the proceedings before the bankruptcy court; (4) whether the affected parties have adequate notice and opportunity to participate in the appeals; and (5) whether the party seeking relief diligently pursued administrative and judicial remedies to stay the order if doing so would prevent later prejudice to the parties if the order is reversed. *Chateaugay*, 10 F.3d at 952–53.

When assessed in light of the relief requested here, these factors weigh heavily against a finding of mootness. Aetna proposes three remedies—remand, modification, or reversal of the Settlement Order—none of which will affect Debtors' reemergence under the Plan or otherwise unravel the bankruptcy court proceedings. According to appellees, National Fire has already paid to Debtors approximately $6 million. Accordingly, if the Settlement Order is modified so that National Fire is not released from liability to Aetna, the most that National Fire could owe to Aetna would be approximately $1 million. Alternatively, if the Settlement Order is reversed, or the Settlement is rescinded by the parties subsequent to modification of the Settlement Order, Debtors would have to return approximately $6 million to National Fire, the majority or entirety of which Debtors presumably could recover by commencing an action under the National Fire Bond. It is difficult to conceive how a potential liability of, at most, several million dollars could unravel the Debtors' reorganization, which involved the transfer of billions of dollars, and which has resulted in the revival of Debtors into a multi-billion dollar operation with $200 million in working capital. Reversal or modification of the Settlement Order may unravel the Settlement, but appellees have made no showing that it would "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." *Id.* at 953 (internal quotations omitted).

The remaining factors similarly militate against a finding of mootness, as Aetna has opposed and sought to stay confirmation of the Settlement at virtually every opportunity in bankruptcy court and this court, and appellees have participated in all such proceedings. *See id.* Accordingly, Aetna's appeal is not moot, as the relief that it requests would neither unravel the reorganization plan, nor adversely affect parties not before this court. *Id.*

## III.

The crux of Aetna's appeal is that the bankruptcy court exceeded its authority

when it extinguished all claims against National Fire concerning the National Fire Bond. Aetna argues that a bankruptcy court lacks the authority to extinguish the debts of a non-debtor, and even if a bankruptcy court has such authority, that authority was improperly exercised in this case.

■ Although a bankruptcy court has express statutory authority to discharge a Debtor's pre-petition debts and contractual obligations, 11 U.S.C. §§ 727, 1141, there is no parallel statutory provision explicitly authorizing a bankruptcy court to discharge the debts of a non-debtor. Aetna asserts that § 524(e) of the bankruptcy code bars a bankruptcy court from releasing claims against non-debtors, and cites several cases outside this circuit to support this assertion. *See Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985) ("the bankruptcy court has no power to discharge the liabilities of a nondebtor"); *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982) ("the bankruptcy court has no power to discharge the liabilities of a bankrupt's guarantor"). However, § 524(e) does not address whether a bankruptcy court can expressly discharge or otherwise affect the liability of a non-debtor. This section provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt," 11 U.S.C. § 524(e), which is to say, a bankruptcy court's discharge of a debtor does not by itself relieve a co-debtor or non-debtor of liability.

■ A more pertinent provision of the Bankruptcy Code, not cited by Aetna, is § 105(a), which states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Several circuit courts, including the Second Circuit, have cited § 105(a) as a basis for a bankruptcy court to release a non-debtor from liability to third parties. *See, e.g., MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *In re A.H. Robins Co.,* 880 F.2d 694, 701 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). However, § 105(a) does not give a bankruptcy court unfettered discretion to discharge a non-debtor from liability. The language of § 105(a) limits the bankruptcy court's discretion to acts necessary or appropriate to carry out the purposes of the Bankruptcy Code, which was intended to provide protection to debtors, not non-debtors. *See Norwest Bank Worthington v. Alhers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988) (a bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code").

Accordingly, bankruptcy courts have permanently enjoined future lawsuits against non-debtors only where such a step was essential to confirmation of the Plan. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 293 (2d Cir.1992) (a non-debtor funding a reorganization plan may be released from liability to a third party if such release "plays an important part in the debtor's reorganization plan"). In *In re Drexel Burnham,* 960 F.2d at 293, for example, the Second Circuit affirmed the approval of a settlement agreement enjoining a class of creditors from bringing future actions against certain non-debtors because the "[a]greement was unquestionably an essential element of [debtor's] ultimate reorganization[, and] the injunction [was] a key component of the Settlement Agreement." Similarly, in *Johns–Manville Corp.,* 837 F.2d at 93, in which the Second Circuit affirmed a bankruptcy court's injunction of future asbestos-related lawsuits against non-debtor insurers, the court found that "the insurance settlement/injunction arrangement was essential ... to a workable reorganization." Other circuit courts that have permitted a bankruptcy court's release of a non-debtor similarly have found that the release must be necessary to the debtor's reorganization. In *In re A.H. Robins,* 880 F.2d at 701, also involving a bankruptcy court's release of non-debtor insurers contributing to a settlement plan, the Fourth Circuit found that "the entire reorganization hinge[d] on" the discharge of the settling insurers.

Here, the bankruptcy court stated merely that "the Settlement is so close to the nexus of the reorganization that it can be considered in conjunction with the Plan here." Appellees insist that this constitutes a finding

comparable to findings in the cases discussed above that validated the release of non-debtors from liability. It does not. Rather, in the May 19 Hearing, the bankruptcy court found merely that the Settlement, and perhaps the discharge of National Fire in the Settlement, was related to the Plan, not that it is necessary or even important to it. Which is to say, the bankruptcy court made a finding sufficient to establish jurisdiction over the Settlement, *see, e.g., Johns–Manville*, 837 F.2d at 92 (finding that third party's claims against non-debtor are not "too remote from the Chapter 11 proceeding to permit the Bankruptcy Court to exercise jurisdiction"), not a finding sufficient to approve it.

Also, the bankruptcy court did not make a finding as to whether Aetna's rights would be impaired by National Fire's discharge in the Settlement. Several of the cases cited by appellees in support of the bankruptcy court's authority to discharge a non-debtor involved no impairment of third-party claims. In *Johns–Manville*, 837 F.2d at 91, for instance, the Second Circuit concluded that third parties' claims against the discharged insurer were not "extinguished ... [but were] simply channeled away from the insurers and redirected at the proceeds of the settlement." Similarly, in *In re A.H. Robins*, 880 F.2d at 701, the Fourth Circuit noted that the permanent injunction affected only those claimants who chose to "opt out" of a settlement that provided for "their claims [to be] fully satisfied." Here, the bankruptcy court stated that Aetna's lawsuit against National Fire "is not before me and I am not prepared to pass on the merits of it," (R. D–7 at 17–18) which suggests, and Debtors concede (Debtors Br. at 7), that the bankruptcy court was under the mistaken impression that the Settlement Order would not affect Aetna's pending action against National Fire.

In addition, there are no facts in the record to support a finding that the Settlement and, more significantly, the discharge in the Settlement, were essential to the Plan. National Fire's $6 million contribution to a Plan involving the investment of hundreds of millions of dollars is a pittance when compared to the proportionately larger contributions by non-debtors that courts have found justify a discharge. In *Johns–Manville*, 837 F.2d at 90, for example, the discharged insurers contributed $770 million to the debtor, and in *In re Drexel Burnham*, 960 F.2d at 288–89, the release provisions enabled hundreds of millions of dollars to be channeled into a pool to benefit creditors. The discharged non-debtors' contributions in *Johns–Manville* and *In re Drexel Burnham* obviously were a significant portion of the funds pooled for the debtors, not a small fraction as is true here.

Appellees argue that there is no error in the Settlement Order because Aetna has no valid cause of action to assert against National Fire. Appellees argue that even assuming Aetna and National Fire acted as co-sureties, the Settlement would do no more than release Aetna from liability to Debtors in the amount that National Fire could have been compelled to pay to Debtors, rather than generate a direct liability from National Fire to Aetna. (Natl. Fire Br. at 18–19) Further, appellees contend that Aetna has no factual basis to assert a claim against National Fire because Aetna's liability for workers' compensation claims under its bond would have been exhausted, even if National Fire never made a single payment under its bond. Appellees point to evidence introduced at the May 19 Hearing that the total liability for workers compensation claims during the Aetna Bond period was $42 million, well above the combined $34 million maximum sum that Aetna and National Fire were liable for under their respective bonds.

Appellees may be correct, and it is possible that the merits of a third party's cause of action against a discharged non-debtor might properly be considered by a bankruptcy court when considering the propriety of a discharge. *Cf. In re Texaco Inc.*, 92 B.R. 38, 44 (S.D.N.Y.1988) (noting that claims against discharged non-debtor were of "questionable value"). However, this consideration may not replace the requisite finding that the discharge is important to the reorganization, particularly where, as here, the party seeking relief has proffered at least a colorable claim. (Aetna Br. at 8 n. 4) Appellees' argument that Aetna's claims are baseless, if true, suggests only that National Fire will suffer little or no prejudice if the shield of the Settlement Order is removed because National Fire would receive the relief in the Connecticut action that it seeks here: a deci-

sion that Aetna has no cause of action against it.

Because the bankruptcy court did not apply a correct legal standard when assessing the propriety of the Settlement, the Settlement Order is subject to *de novo* review. *In re Ionosphere*, 154 B.R. 623, 627 (S.D.N.Y. 1993) and cases cited therein. The Settlement Order is vacated and the case is remanded to the bankruptcy court either for modification that would permit Aetna to seek to establish in the Connecticut Action that it should receive the funds National Fire owed to Debtors under the National Fire Bond, or for a finding supported by the record that the Settlement Order is essential to the Plan.

SO ORDERED.