**In re FOURS ON SEVENTH, LLC, Debtor.**

**Regency Savings Bank, F.S.B., Appellant,**

**v.**

**Fours on Seventh, LLC and 330 Acquisition Co., LLC, Appellees.**

No. M–47 (SAS).

Nos. 00–Civ.–4305(SAS),00–Civ.–4307(SAS), 00–Civ.–4308(SAS).

United States District Court, S.D. New York.

Aug. 16, 2000.

Joseph Aronauer, John C. Re, Kenneth S. Yudell, Aronauer, Goldfarb, Sills & Re, LLP, New York City, for Regency Savings Bank, F.S.B.

Kevin J. Nash, Finkel Goldstein Berzow Rosenbloom & Nash LLP, New York City, for Fours on Seventh, LLC.

Robert E. Grossman, Andrew I. Silfen, Peter S. Cohen, Olshan Grundman Frome Rosenzweig & Wolosky LLP, New York City, for 330 Acquisition Co., LLC.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Regency Savings Bank, F.S.B. ("Regency") appeals from three Orders of the United States Bankruptcy Court for the Southern District of New York (Bohanon, B.J.): (1) confirming the First Amended Plan of Reorganization (the "Plan") of Fours on Seventh, LLC (the "Debtor"); (2) expunging Regency's claim; and (3) approving Debtor's amended disclosure statement. Regency argues that the Bankruptcy Court erred by: (1) holding that Regency was not a creditor of Debtor and therefore was not eligible to vote on the Plan; (2) holding that 330 Acquisition Co. ("330 Acquisition") was not an insider of Debtor and therefore permitting 330 Acquisition to vote in favor of the Plan; and (3) concluding that the Plan was proposed in good faith, in compliance with 11 U.S.C. § 1129(a)(3). Submitting a joint brief in response, 330 Acquisition and Debtor ("Appellees") dispute Regency's arguments, contend that Regency lacks standing to pursue this appeal, and assert that this appeal is moot.

For the reasons set forth below, I conclude that Regency's appeal is moot.

## I. FACTS AND PROCEDURAL HISTORY

The background of this case is exceptionally complicated. Nevertheless, a thorough review of that background is a prerequisite to analyzing Regency's appeal.

### A. The Underlying Financial Transactions

On February 17, 1989, Four Star Holding Co. ("Four Star") delivered to American Savings Bank ("ASB") a mortgage on property located at 330 Seventh Avenue,

New York, New York (the "Property"), in the principal amount of $2,085,131.05, and simultaneously executed an agreement to consolidate the ASB mortgage with prior mortgages to form a single lien in the amount of $15,000,000 (the "Loan"). *See Federal Deposit Insurance Corporation v. Four Star Holding Co.,* 178 F.3d 97, 99 (2d Cir.1999) *("Four Star II ")*.[1]

Pursuant to a participation agreement dated March 15, 1989 (the "Participation Agreement"), ASB assigned its entire right, title, and interest in the Loan to John Hancock Mutual Life Insurance Company ("Hancock"). *See* 3/15/89 Participation Agreement between John Hancock Mutual Life Insurance Co. and American Savings Bank, F.S.B., Ex. C to 4/11/2000 Affidavit of Joseph Aronauer in Support of the Order to Show Cause by Regency Savings Bank for a Stay Pending Appeal ("Aronauer Aff."). As part of the same transaction, Hancock sold to ASB an undivided interest in the Loan "of equal status and rank without priority and preference of one over the other." *Id.*

In June 1992, the New York State Superintendent of Banks appointed the Federal Deposit Insurance Corporation ("FDIC") receiver of ASB, and FDIC assumed ASB's place in the Participation Agreement. *See Four Star II,* 178 F.3d at 99.

On November 1, 1994, Four Star and Hancock modified the terms of the Loan. *See* Note and Mortgage Modification Agreement (Nov. 1, 1994), Ex. F. to Aronauer Aff. FDIC was not a party to the Modification Agreement. *See id.*

According to Regency, Four Star failed to make any payments on the Loan after August 1, 1996. *See* Brief of Appellant Regency Savings Bank, F.S.B. ("Appel-

---

1. A related lawsuit involving these same parties has spawned four opinions, all of which provide useful summaries of the relevant facts. *See Federal Deposit Insurance Corporation v. Four Star Holding Co.,* 97 Civ. 4184, 1998 WL 205323 (S.D.N.Y. Apr.24, 1998) *("Four Star I "), vacated,* 178 F.3d 97 (2d Cir.1999) *("Four Star II "), on remand,* 2000 WL 256146 (S.D.N.Y. Mar.7, 2000) *("Four Star III "), stay denied,* 2000 WL 718443 (S.D.N.Y. June 5, 2000) *("Four Star IV ").*

lant's Brief") at 9–10; *see also Four Star II,* 178 F.3d at 99 ("FDIC alleges that, beginning in August 1996, Four Star stopped making its monthly mortgage payments and thereby defaulted on the mortgage."). By deed dated December 6, 1996, Four Star transferred its ownership of the Property to Debtor. *See* D–23, Ex. F (deed).[2]

### B. Developments in the Courtroom and the Boardroom

On April 22, 1997, FDIC demanded that Hancock commence a foreclosure action against Debtor. *See Four Star II,* 178 F.3d at 99. After Hancock failed to respond, FDIC commenced its own foreclosure action pursuant to New York Real Property Actions and Proceedings Law § 1315 (the "Federal Foreclosure Action"). *See id.* FDIC asserted federal jurisdiction pursuant to 12 U.S.C. § 1819(b)(2)(A), which grants federal courts jurisdiction over suits to which the FDIC is a party. *See id.*

On July 25, 1997, after offering FDIC the right of first refusal under the Participation Agreement, Hancock sold its share of the Loan to 330 Acquisition for $6,000,-000. *See id.; see also Four Star II,* at 99. Before selling its share to 330 Acquisition, Hancock made clear that it would not sell to Debtor or anyone associated with Debtor.[3] *See* D–51 (Transcript of March 31, 2000 Hearing before the Bankruptcy Court), Ex. 4 (3/24/2000 Deposition of Allen S. Greene), at 26–27 ("Greene Dep."). Faced with this refusal, Ben–Dov and Buchbinder enlisted the help of Allen Greene, a friend and sometime business partner of Ben–Dov's. *See* Greene Dep. at 7–33. On May 21, 1997, 330 Acquisition was formed with Greene as its sole member. *See* D–30 (Affidavit of Joseph Aro-

nauer in Opposition to 330 Acquisition's Motion for Discovery Relief), Ex. R (10/7/97 Affidavit of Allen S. Greene), ¶ 2; *see also* Greene Dep. at 27. After Greene was unable to raise the money to purchase Hancock's share from independent lenders, he asked Ben–Dov to lend him the money. *See* Greene Dep. at 25. Ben–Dov and Buchbinder then lent Greene the entire $6,000,000 required to purchase Hancock's interest in the Loan. *See* D–42 (3/24/2000 Affidavit of Allen S. Greene in Support of the Confirmation of the Debtor's Plan of Reorganization), Exs. E (Note) and F. (Limited Liability Company Membership Interest Pledge and Assignment and Security Agreement). On August 11, 1997, 330 Acquisition initiated its own foreclosure action in New York state court (the "State Foreclosure Action"). *See Four Star II,* at 99.

On December 17, 1997, FDIC assigned to Regency its participation interest in the Loan. *See* Assignment of Participation Interest (Dec. 17, 1998), Ex. T to Aronauer Aff. According to 330 Acquisition, FDIC failed to offer 330 Acquisition the right of first refusal before making the assignment to Regency. *See* Appellees' Joint Brief at 20–21. 330 Acquisition then filed a second action in New York state court (the "Participation Litigation"), alleging that: (1) FDIC breached the Participation Agreement; (2) Regency tortiously interfered with 330 Acquisition's right of first refusal; and (3) Regency is not a bona fide purchaser of FDIC's participation interest in the Loan. *See id.*

On April 24, 1998, Judge Keenan abstained from hearing the Federal Foreclosure Action, based on the pendency of the State Foreclosure Action. *See Four Star II,* at 99. On May 21, 1999, however, the Second Circuit reversed and remanded the

---

. **2.** The designation "D–23" indicates the location of the cited document in the record on appeal.

**3.** Trusts for Zohar Ben–Dov and his family have an 80% interest in Debtor, while trusts for Norman Buchbinder and his family have

an 18.5% interest. *See* D–2 (List of Equity Holders attached to Voluntary Petition). The sole trustee for each of these trusts in Andrew Albstein. *See* D–5 (Debtor's Disclosure Statement Pursuant to 11 U.S.C. § 1125), at 9.

case to the district court. *See Four Star II*, 178 F.3d at 101–02.

## C. Initiation of Bankruptcy Proceedings

On January 27, 2000, Debtor filed its voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Litigation"). *See* D–2 (Voluntary Petition). On February 22, 2000, Regency filed a Proof of Claim in the amount of $25,780,725. *See* D–8 (Proof of Claim). On March 9, 2000, Debtor and 330 Acquisition jointly objected to Regency's claim. *See* D–19 (Joint Objection to Claim of Regency Savings Bank, F.S.B.). That same day, Debtor and 330 Acquisition submitted a stipulation settling 330 Acquisition's claim, which had been filed on March 6, 2000. *See* D–20 (Stipulation of Settlement Between the Debtor and 330 Acquisition Co., LLC).

## D. Dismissal of the Federal Foreclosure Action

As the parties dueled in the Bankruptcy Litigation, Judge Keenan dismissed the Federal Foreclosure Action. *See Four Star III*, at *3–5. Judge Keenan held that according to the Participation Agreement, only Hancock (now 330 Acquisition) could bring a foreclosure action and therefore the action filed by FDIC (now Regency) should be dismissed. *See id.* Interpreting the language of the Participation Agreement, Judge Keenan concluded:

> [I]t is clear that the Participants intended to waive any rights that ASB might have had under § 1315. The two Participants under the Agreement were equal owners of the Loan. Nevertheless, they affirmatively chose to upset that equilibrium by giving Hancock the exclusive power to act on behalf of both Participants in the case of a default.

***

In the event of a default, ASB empowered Hancock to act as its attorney-in-fact, an expressly irrevocable power coupled with an interest. Indeed, Hancock was charged with the power to administer the Loan in all respects, and its decisions would control under the Agreement in disputes between the Participants. Hancock was obligated to apprise ASB of any foreclosure or other enforcement proceedings, but the Agreement made clear that Hancock alone was to choose whether and how to enforce any available remedies. By entering the Agreement, ASB clearly waived its foreclosure rights under § 1315.

*Id.* at *5.[4]

## E. A Return to the Bankruptcy Proceedings

On March 23, 2000, the Bankruptcy Court ruled that Regency was a "party in interest" pursuant to 11 U.S.C. § 1109 and therefore could object to the confirmation of the Debtor's proposed reorganization plan. *See* D–36 (Memorandum Decision and Order Concerning Motion to Quash and/or for the Entry of a Protective Order) at 4. In the same decision, the Bankruptcy Court allowed Regency to take discovery regarding whether 330 Acquisition was an "insider" of the Debtor. *See id.* at *5. The Bankruptcy Court stated: "As a 50% participant under the participation agreement, [Regency] has a sufficient stake in the outcome of the confirmation hearing, especially where Regency's interest is affected by the treatment of the Secured Mortgage Claim, and the determination of whether 330 Acquisition is an 'insider' of the Debtor is a statutory requirement for confirmation of the Debtor's Plan." *See id.* At the same time, the Bankruptcy Court explicitly reserved decision on "the issues of Regency's standing as a creditor and its entitlement to vote on the Plan." *See id.*

On March 24, 2000, Debtor submitted an amended plan of reorganization (the

---

4. Regency has appealed Judge Keenan's dismissal. Briefing is scheduled to be completed on September 27, 2000 and oral argument is tentatively set for November 6, 2000.

"Plan"). *See* D–39 (Debtor's First Amended Plan of Reorganization). Under the terms of the Plan, Debtor would pay 330 Acquisition $18,702,469.73 plus per diem interest through the date of the payment and, in exchange, 330 Acquisition would assign the mortgage instrument underlying the Loan to a lender specified by Debtor. *See id.* at 10. According to Regency, the practical effect of the Plan was that 330 Acquisition agreed not to require Debtor to pay default interest in the amount of $6,200,000 on the Loan. *See* Appellant's Brief at 25. Because of Regency's objection, the Plan called for the creation of an escrow account of 50% of the amount alleged by Regency to be due under the Loan (the "Escrow"). *See* D–39 at 11. The Plan stated that if Regency was unable to obtain an order in the Participation Litigation enjoining the release of the Escrow, within 60 days of the confirmation of the Plan, then the Escrow would be reduced to 50% of the amount paid to 330 Acquisition. *See id.* at 11–12. That amount would be held in escrow "pending a determination of Regency's rights under the Participation Agreement in the Participation Litigation." *See id.*

At a hearing on March 29, 2000, the Bankruptcy Court heard oral argument on the objection to Regency's claim. *See* D–50 (Transcript of March 29, 2000 Hearing) at 19–58. Two days later, the Bankruptcy Court continued that hearing and disallowed Regency's claim. *See* D–51 (Transcript of March 31, 2000 Hearing) at 6. After reviewing Judge Keenan's opinion dismissing the Federal Foreclosure Action and discussing some cited authorities, the Bankruptcy Court stated:

> What this fundamentally comes down to in my estimation is simply an interpretation of the contract. You can look at all these other cases and they deal with different contracts. The language of course that the [courts] dealt with in those situations is not the same language as is present in this case which I read to mean that Regency is not

a[c]reditor for bankruptcy purposes, and I read it the same way that Judge Keenan did; so for these reasons the joint objection of the Debtor and 330 [Acquisition] to disallow and expunge the Regency claim is granted.

D–51 at 15. After hearing oral argument and receiving evidence, the Bankruptcy Court concluded that the Plan was proposed in good faith and that 330 Acquisition was not an insider of the Debtor. *See id.* at 88–94. Specifically, on the insider question, the Bankruptcy Court stated:

> Then on the insider question, ever since my first involvement with this case I've been concerned about that and I've heard the arguments. I've read the arguments. I've been looking to see if there was any evidence that would show 330 [Acquisition] to be an insider of [Debtor].
>
> Now, the time for that evidence has come and I simply, I don't find any evidence that convinces me that [Debtor] is controlled by 330 Acquisition. These people, Ben–Dov and Greene, they are or they were friends. They've been business associates. They apparently were involved in the banking business together. They've served together on boards of directors. They've had disagreements among themselves. They apparently had agreements, but this doesn't mean that one controls the other.
>
> There just simply isn't any proof from which I can find as a matter of fact that 330 [Acquisition] is an insider of the Debtor. Therefore, its vote in that class doesn't count. Simply, that proof just isn't there.
>
> The way, from my understanding of what the definition is, you get to control, you look to things like, which is one of the things mentioned, if a general partner of a general partnership controls that partnership, and I simply don't find that kind of control here.
>
> There were relationships. In fact, [counsel for Regency] made the argu-

ment that they're not unrelated. Well, no, they're not unrelated. They've known each other. They've worked together. They've done business together, but that's not the test. The test is whether or not one controls the other. I've simply been unable to find that. They have dealt together, 330 [Acquisition] and [Debtor] have dealt together concerning this loan. Well, lenders and borrowers do deal together and just because one is a borrower and one is a lender, doesn't mean that in many instances they have interests in common which is to the lender's interest is to get the loan paid with the best they can get out of it.

And that is not necessarily an adversarial relationship between the two. It can be. It cannot be, but the fact that they worked together and have common purposes to get the loan refinanced, get the property sold, there might be a lot of reasons that they would work together and they probably have done that here, but I find nothing wrong in the fact that has happened.

*Id.* at 91–93. Regency immediately moved to stay confirmation of the Plan, but the Bankruptcy Court denied that request. *See id.* at 95–99.

### F. Post–Confirmation Activity

Regency then moved this Court to stay confirmation of the Plan pending appeal. On April 17, 2000, I denied Regency's request for a stay. *See* Transcript of April 17, 2000 Conference ("Apr. 17 Tr."). Before I ruled on Regency's motion, however, the parties changed the terms of the Escrow, with 330 Acquisition agreeing to keep the entire Escrow amount in place until the Second Circuit had ruled either in this litigation or in the Federal Foreclosure Action. *See id.* at 37. This change effectively eliminated the provision that allowed 330 Acquisition to reduce the Es-

crow if Regency was unable to obtain an injunction from the state court in the Participation Litigation. Once the Second Circuit has ruled in either case, 330 Acquisition could again move in this Court for a reduction in the Escrow. *See id.* at 37–38. With that change to the Escrow in place, I denied Regency's request for a stay because Regency had failed to demonstrate a danger of irreparable harm. *See id.* at 37–39. Regency did not seek to stay confirmation of the Plan in the Second Circuit.

This Court's denial of the stay triggered a number of transactions related to the confirmation of the Plan. On April 21, 2000, Debtor transferred its assets and liabilities to Super Nova 330 LLC ("Super Nova"), the reorganized debtor. *See* Exs. H (Assignment of Leases and Rents), K (Indenture) and M (Assignment of Rent Arrears and Landlord/Tenant Causes of Action) to Appendix to Joint Brief of Appellees 330 Acquisition Co., LLC and Fours on Seventh, LLC ("Appellees' Appendix"). That same day, 330 Acquisition assigned the mortgage note underlying the Loan to Qualified Intermediary Accommodation Corp. ("Qualified"). *See* Assignment of Mortgage, Ex. E to Appellees' Appendix. In addition, Super Nova and Qualified entered into a Note and Mortgage Modification Agreement. *See* Note and Mortgage Modification Agreement, Ex. F to Appellees' Appendix.[5] On April 25, 2000, the parties discontinued the State Foreclosure Action without prejudice. *See* 4/25/2000 Stipulation of Discontinuance without Prejudice, Ex. D to Appellees' Appendix. That same day, the parties also created the Escrow. *See* Escrow Agreement, Ex. O to Appellees' Appendix.

Debtor also settled its liabilities with other creditors. *First,* a settlement with Isogon Corporation, a tenant in the Property, was implemented. *See* Appellees' Joint Brief at 24. *Second,* distributions totaling more than $300,000 were made to

---

**5.** On July 20, 2000, Qualified assigned the mortgage on the Property to the Bank of New York. *See* Assignment of Mortgage, attached

to July 21, 2000 Letter from Kevin J. Nash, counsel for Debtor, to this Court.

all unsecured creditors. *See id.* at 24–25. *Third,* Debtor gave a Note in the amount of $405,161.98 to Newmark & Company Real Estate ("Newmark"), which performed management services for the Property. *See* Note, Ex. F. to Appellees' Appendix.

The parties also engaged in a few more legal skirmishes. Regency moved before Judge Keenan to extend the Notice of Pendency on the Property and stay his dismissal of the Federal Foreclosure Action. Judge Keenan denied both motions. *See Four Star IV,* at *1–2. At the same time, 330 Acquisition and Debtor moved the Second Circuit to dismiss as moot Regency's appeal of Judge Keenan's dismissal. The Second Circuit denied that motion, stating that Regency "has an interest in the outcome of the appeal sufficient to present a case and controversy for review." *See* Order, *Federal Deposit Insurance Corporation v. Four Star Holding Co.,* 00–6112, Ex. C to Supplemental Appendix of Appellant ("Supplemental Appendix"). The Second Circuit also denied Regency's motion to stay the expiration of the Notice of Pendency on the Property. *See id.*

On June 28, 2000, 330 Acquisition wrote to inform the Court that it would "keep the entire $13 million amount in escrow until the State Court rules on the merits of the case before it." *See* June 28, 2000 Letter from Robert E. Grossman, counsel for 330 Acquisition, to this Court ("June 28 Letter"). 330 Acquisition explained that this modification eliminated 330 Acquisition's "right under the Plan (as amended by agreement with this Court) to make a judicial application to release $3 million of the total because this Court or the Second Circuit ... has reached a decision." *See id.* On June 30, 2000, Regency responded that this change to the Escrow was not

sufficient because 330 Acquisition had not consented "to the money remaining in escrow until all three litigations [the Federal Foreclosure Action, this action, and the Participation Litigation] have reached finality, including appeals." *See* June 30, 2000 Letter from Kenneth S. Yudell, counsel for Regency, to this Court ("June 30 Letter").

330 Acquisition did not respond to the June 30 Letter and clarify its position. Nevertheless, the only fair reading of the June 28 Letter is that 330 Acquisition has agreed to maintain the entire $13,000,000 in the Escrow pending final resolution, including appeals, of all three cases. In the June 28 Letter, 330 Acquisition quotes from Regency's reply brief. *See* June 28 Letter ("Regency itself advises this Court in its Reply Brief 'that there is no inequity' if the funds are held in escrow 'until there is a final resolution on all three cases.' "). The quoted language comes from the following paragraph:

> Alternatively, the Court could direct that the money be held in escrow, without permitting any money to be removed, until there is finality (inclusive of appeals) in the Participation Litigation, [the Federal Foreclosure Action] and this matter. As with the prior alternative, there is no inequity in this result since the money is intended for this purpose and all interested parties are before the Court. Further, since all of these cases are related, the funds should not be released until there is a final resolution in all three cases.

Reply Brief of Appellant Regency Savings Bank, F.S.B. ("Appellant's Reply Brief") at 7. 330 Acquisition claims that the change in the Escrow "is consistent with Regency's position both on this appeal and in the Second Circuit." June 28 Letter.[6] Be-

---

**6.** Indeed, 330 Acquisition used similarly forceful language before the Second Circuit. *See* 5/3/2000 Affidavit of Andrew I. Silfen, counsel for 330 Acquisition, in Support of Motion to Dismiss Appeal, Ex. B to Supplemental Appendix, at ¶ 34 n. 5 ("Notwithstand-

ing the terms of the Plan, 330 Acquisition also agreed that the full amount of those funds would remain in escrow pending the final determination of the parties' rights. In short, if the [Participation Litigation] is ultimately determined in [Regency's] favor, it will be

cause Regency's position could not have been made any clearer in its reply brief, I conclude that the money will remain in the Escrow until all appeals in all three cases have been exhausted.

### G. Current Procedural Posture

To summarize, this Court is considering Regency's appeal from the Bankruptcy Court's confirmation of the Plan. The dismissal of the Federal Foreclosure Action is on appeal to the Second Circuit. The parties have dismissed the State Foreclosure Action without prejudice. The Participation Litigation is pending in state court. The parties have placed approximately $13,000,000 in escrow pending final resolution of this action, the Federal Foreclosure Action, and the Participation Litigation. Debtor has been reorganized as Super Nova, the creditors have been paid, and the Bank of New York currently holds the mortgage on the Property. I now proceed to Regency's appeal.

## II. DISCUSSION

 Appellees argue that Regency's appeal is moot because the Plan has been substantially consummated and Regency fails to meet the criteria for proceeding despite that consummation as set forth in *In re Chateaugay Corp.*, 10 F.3d 944 (2d Cir.1993). Although reluctantly admitting that the Plan has been substantially consummated, Regency contends that it has satisfied the *Chateaugay* factors. In *Chateaugay,* the Second Circuit explained that "[s]ubstantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." *Id.* at 952. The Second Circuit then explained the circumstances in which substantial confirmation does not render an appeal moot:

In bankruptcy proceedings, the mootness doctrine involves equitable consid-

erations as well as the constitutional requirement that there be a case or controversy. These concerns often cannot be addressed separately; they are interactive, as the finality rule limits the remedies a court can offer. Constitutional and equitable considerations dictate that substantial consummation will not moot an appeal if all of the following circumstances exist: (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Id.* at 952–53 (quotation marks and citations omitted).

Regency argues that this Court can still order effective relief by: (1) reversing the Bankruptcy Court's confirmation of the Plan; (2) directing immediate payment of the entire Escrow to Regency; or (3) modifying the Escrow to ensure that the entire amount is retained pending final resolution (including appeals) of this action, the Federal Foreclosure Action, and the Participation Litigation. Regency's second and third alternatives, however, do not constitute effective relief because neither is a proper response to the Bankruptcy Court's allegedly erroneous confirmation of the Plan. For example, if Regency is a creditor

paid everything it is entitled to under the mortgage loan from the funds that are pres-

ently being held in escrow.").

of Debtor, then it should have been allowed to vote on the Plan. Neither modifying the Escrow nor directing immediate payment of that Escrow to Regency cures that problem. The only remedial action would be to reverse the Bankruptcy Court's confirmation of the Plan and remand for further proceedings. The same holds true if 330 Acquisition is an insider of Debtor or if the Plan was not proposed in good faith.

Although Regency repeatedly argues that this Court could direct immediate payment of the Escrow to Regency, it offers neither citation nor justification to support that view. The Plan itself makes clear that the Escrow is "to be held pending a determination of Regency's rights under the Participation Agreement in the Participation Litigation." Debtor's First Amended Plan of Reorganization, Ex. B to Aronauer Aff. As for modification of the Escrow, I have explained above that the requested modification already is in place. *See supra* Part I.F. Despite that modification, however, the parties have not withdrawn this appeal, thereby demonstrating that simply modifying the Escrow does not constitute effective relief for Regency's claims. Reversal of the Bankruptcy Court's confirmation of the Plan constitutes the only effective relief in this case, forcing the Court to address whether that relief can be ordered in accordance with the other four *Chateaugay* factors.

■ After careful consideration, I conclude that Regency cannot satisfy the requisite factors and that its appeal therefore is moot. The third *Chateaugay* factor clearly favors Regency, because this case involves a small number of relatively simple transactions and therefore reversing the Bankruptcy Court's confirmation would not "unravel intricate transactions" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court." *Chateaugay*, 10 F.3d at 953. The fourth and fifth factors, however, are more troublesome. In order to satisfy the fourth factor, Regency consents to allowing all unsecured creditors to be paid in full or retain any payments already made. *See* Appellant's Brief at 47; Appellant's Reply Brief at 4. Even assuming that concession covers Isogon and Newmark as well, the current holder of the mortgage on the Property, Bank of New York, remains a potentially affected party who has not participated in these proceedings. As for the fifth factor, while Regency certainly has "pursued with diligence" its remedies before both the Bankruptcy Court and this Court, Regency did not appeal this Court's denial of a stay of confirmation of the Plan to the Second Circuit. Although Regency persuasively argues that this failure is not fatal to its claim, it nevertheless makes consideration of the fifth factor a much closer question.

The real problem for Regency, however, is the second factor, which requires that the relief "not affect the reemergence of the debtor as a revitalized corporate entity." *Chateaugay*, 10 F.3d at 953 (quotation marks and citation omitted). Debtor has reemerged as Super Nova, which owns the Property and has arranged new financing with Bank of New York. Reversing the Bankruptcy Court's confirmation of the Plan would cause a chain reaction that returns the Property to Debtor and the financing to 330 Acquisition and Regency. Indeed, Regency itself characterizes its requested relief as "unwinding the transaction and returning the parties to the status quo." Appellant's Brief at 46.

■ Where appellant seeks relief that would reverse a substantially consummated plan and thereby impact debtor's reemergence, courts hold that the appeal is moot. *See In re E–II Holdings Inc.*, 94 Civ. 2246, 1995 WL 387650, at \*5 (S.D.N.Y. June 30, 1995) ("Even assuming that I could fashion some sort of relief in this case, disruption of the consummated Plan at this point undoubtedly would affect the reemergence of the debtor as a revitalized corporate entity and unravel intricate transactions between the debtor and third parties who relied upon the finality of the

Plan.") (quotation marks omitted); *see also In re Ionosphere Clubs,* 184 B.R. 648, 652 (S.D.N.Y.1995) ("The appellants do not seek to modify a discrete aspect of the Plan that would leave the remainder of the Plan intact. Rather, the appellants challenge the Plan in its entirety—they seek to undo sales of assets made both prior to and following the confirmation of the Plan."). I note that, because mootness analysis focuses on the impact that reversal of a consummated plan would have on third parties, cases where appeals are found to be moot often involve a much larger number of creditors and transactions. *See In re E–II Holdings,* 1995 WL 387650, at *5 (post-bankruptcy transactions "included, among other things, over a billion dollars of transfers from the debtor to its creditors, the procurement of financing for the post-bankruptcy corporation, and the issuance of stock and other securities in the post-bankruptcy corporation"); *In re Ionosphere Clubs,* 184 B.R. at 652 ("Since the confirmation of the Plan, tens of thousands of creditors have received millions of dollars in distributions under the Plan. These assets and distributions cannot be recouped."). Nevertheless, the same concerns are present in this case, albeit on a smaller scale. Debtor has re-emerged as Super Nova, which has obtained new financing for the Property.

■ On the other hand, where the relief requested would not involve reversal of the entire bankruptcy plan, courts usually hold that the appeal is not moot. *See In re Burger Boys, Inc.,* 94 F.3d 755, 760 (2d Cir.1996) (court could reverse debtor's assumption of a lease, placing creditor in same position as if debtor had not assumed lease); *In re Chateaugay Corp.,* 167 B.R. 776, 779 (S.D.N.Y.1994) (court could reverse settlement order totaling $6,000,000 in bankruptcy proceeding involving "the transfer of billions of dollars"). Indeed, in *Chateaugay* itself, the Second Circuit held

that the appeal was not moot because it "would be able to fashion effective relief to the extent of remanding with instructions to the bankruptcy court to order the return to [appellant] of any funds that were erroneously disbursed to such parties, to the extent that can be done manageably and without imperiling [debtor's] fresh start." *Chateaugay,* 10 F.3d at 953. As explained above, relief short of reversal of the Plan is not available in this case.

Although my research revealed a handful of cases where courts have returned parties to the status quo following substantial confirmation of a Plan, those cases present unique facts and circumstances distinguishable from this case. In *In re Lafayette Hotel Partnership,* 96 Civ. 7476, 1997 WL 599386 (S.D.N.Y. Sept. 29, 1997), Judge Baer limited the scope of available relief to ensure that, should the confirmation be reversed, "any new reorganization plan cannot affect the Debtor's 'reemergence as a corporate entity.'" *Id.* at *4. As explained above, effective relief that does not impact Debtor's reemergence as a corporate entity is not available in this case.[7] In *In re 183 Lorraine Street Associates,* 198 B.R. 16 (E.D.N.Y. 1996), Judge Glasser ruled that effective relief was possible because the building at issue had been sold to appellee, a creditor, who had made "relatively simple and well documented" distributions. *Id.* at 24 ("A reversal would require only that, as a condition of relief, a prevailing appellant reimburse [appellee] for the monies paid in satisfaction of the New York City taxes and all other claims."). Here, although the transactions are relatively simple, the Property is in the hands of a new corporate entity, Super Nova, and a new mortgage holder, Bank of New York. In *183 Lorraine Street,* Judge Glasser explained that "[t]he second [*Chateaugay* ] factor actually militates in favor of consideration of the appeals. Since the debtor's sole asset

---

**7.** In addition, Judge Baer cited no authority for the proposition that the second *Chateaugay* factor "should have less weight where, as

here, the 'corporate entity' is in reality an investment partnership, and not a major industrial corporation." *Id.*

was sold under the Plan, re-emergence of the debtor would be impossible if the appeals were dismissed as moot." *Id.* Although this case also involves the sale of Property constituting Debtor's sole asset, reemergence of the Debtor is not impossible, as evidenced by the fact that such reemergence already has occurred.[8]

In the end, any effective relief would negate Debtor's reemergence as a revitalized corporate entity. Although many of the mootness cases involve much larger transactions and many more innocent third parties, Regency has failed to provide— and my research did not reveal—any authority allowing me to reverse the substantially consummated Plan and return the parties to the status quo. *See Chateaugay,* 10 F.3d at 952 (noting that substantial confirmation will not moot an appeal if all five factors are present); *see also In re Kenwin Shops, Inc.,* 99 Civ. 10485, 2000 WL 351404, at *2 (S.D.N.Y. Apr.5, 2000) ("[Appellant] must show that each of the five *Chateaugay* factors supports maintaining its appeal."). Therefore, Regency's appeal is moot.

To the extent that Regency argues that modification of the Escrow constitutes effective relief, it can take comfort in the fact that the requested modification already is in place. *See supra* Part I.F. Although Regency fears that the Bankruptcy Court's decision will have a collateral effect in other litigations, two circumstances should assuage those fears. *First,* this decision makes clear that the Bankruptcy Court's confirmation of the Plan is not affirmed on its merits.[9] *Second,* the Bankruptcy Court itself made the following statement at the end of the March 31, 2000 hearing:

I'm also requested to somehow maybe reach the conclusion or make a finding that my decision in confirming the plan, which I'm going to do, is not res judicata or estoppel in some other court and to the extent I can do that, I could certainly state that it's not my intention to estop any other court or prevent any other court who may be hearing the dispute between Regency and 330 [Acquisition] from deciding whatever issues are before it.

**********

I'm not, I don't have jurisdiction to, I don't have any reason to, I don't get involved in, the dispute between Regency and 330 [Acquisition]. That's not before me. It can't be before me. I would have no subject matter jurisdiction to entertain that kind of dispute between two non-Debtors, so for whatever it's worth, I'm just only deciding whether or not the plan should be confirmed and my conclusion is in the affirmative and it ought to be confirmed. ·

D–51 at 93–94. With the Escrow in place pending final resolution (including appeals) of the Federal Foreclosure Action and the Participation Litigation, the parties must now shift their focus to those cases.

### III. CONCLUSION

For the foregoing reasons, Regency's appeal is DISMISSED as moot.

SO ORDERED.

---

8. Judge Glasser cited a number of other factors not present in this case, noting that "there will be little left for the Bankruptcy Court to decide, that all relevant parties were before the Court, and that there was no innocent third-party purchaser that would be prejudiced by reversal or modification." *Id.* at *24–*25

9. Specifically, and for clarity of the record, I express no opinion as to whether Regency was a creditor of Debtor, 330 Acquisition was an insider of Debtor, or the Plan was proposed in good faith.